UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA
NORTHEASTERN DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| IVAN MITCHELL, et al., | Case No: 2:15-cv-00086-LLP-ARS |
| Plaintiff | |
| vs. | MEMORANDUM OPINION AND ORDER ON PARTIES' |
| BLUE CROSS BLUE SHIELD OF NORTH DAKOTA and TOWNER COUNTY MEDICAL CENTER – HEALTHCARE REIMBURSEMENT PLAN, | MOTIONS FOR SUMMARY JUDGMENT, DOCS. 77 & 82 |
| Defendants. | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Pending before the Court is Plaintiffs' Motion for Summary Judgment, Doc. 77. In their motion, Plaintiffs argue that Blue Cross Blue Shield of North Dakota's (BCBSND's) adverse benefits determination violated The Employee Retirement Income Security Act of 1974 (ERISA), because the determination, which left the Mitchells owing 79% of the billed charges for Ms. Mitchell's air ambulance transport, was not based on a reasonable reading of the health insurance plan's language and was not based on substantial evidence. Plaintiffs ask that the Court declare Plaintiffs' cost-sharing obligations under this claim are limited to $1,525.83 after all sums are paid by BCBSND.

Also before the Court is Defendant's Motion for Summary Judgment, Doc. 82. In its motion, Defendant[1] first argues Plaintiffs lack Article III and statutory standing to maintain this action. Second, Defendant asserts that BCBSND had discretionary authority to determine the claims for benefits under the health insurance plan at issue and that BCBSND did not abuse their discretion in partially denying Plaintiffs' claim because the partial denial was the result of a reasonable interpretation of the relevant terms of the Plan.

The Court has considered all filings and applicable law and, for the following reasons, Plaintiffs' motion is denied and Defendant's motion is granted.

---

[1] Defendant Towner County Medical Center was never served and has not appeared in this action.

## FACTUAL BACKGROUND

On January 15, 2014, Melissa Mitchell sought emergency medical care at Towner County Medical Center in Cando, North Dakota. Upon examination, Ms. Mitchell's physician determined it medically necessary to transport her to a facility that could provide a higher level of care. Due to impending weather and the need to provide treatment quickly, Ms. Mitchell was transported to another facility via a "fully staffed multi-million-dollar advanced life support fixed wing aircraft." BCBSND does not dispute that the transfer by air ambulance was medically necessary.

At the time of transport, Ivan Mitchell, Ms. Mitchell's husband, was employed by Towner County Medical Center, making him and his spouse eligible for coverage under the Towner County Medical Center—Healthcare Reimbursement Plan (Plan), an "employee welfare benefit plan" and "employee benefit plan" as defined by ERISA. 29 U.S.C. § 1002(1), (3). Mr. Mitchell elected such coverage for himself and his spouse for the 2014 calendar year, which included January 15, 2014, the date Ms. Mitchell sought emergency care. The Plan Document sets forth the terms under which the Plan Administrator, in this case BCBSND, will pay for or reimburse a patient for payments made for health care.

Valley Med Flight, Inc. (VMF), a nonparticipating provider under the Plan, provided the emergency air ambulance transport on January 15, 2014, billing $33,200 for its services. On March 27, 2014, BCBSND paid a total of $6,759.98. This left the Mitchells to cover the remaining $26,440.02: $1,525.83 in coinsurance liability and $24,914.19 in balance bill liability.

On April 21, 2014, VMF reached out to BCBSND requesting reconsideration for additional payment for charges incurred by Ms. Mitchell, stating they wished to resolve the issue "without having to consider any legal intervention or putting a financial burden for $26,440.02 on the patient." Mr. Mitchell also wrote to Kathy Johnson, a BCBSND Specialist, challenging the partial payment and asking for any necessary paperwork so that he may file an appeal. On May 27, 2014, VMF received a letter from BCBSND stating "[t]he claim did process correctly according to the current [BCBSND] fee schedule and the benefit plan's 20% non-participating reduction." BCBSND did not provide a copy of the fee schedule as it is only available to participating providers. On June 13, 2014, Mr. Mitchell also received a letter from BCBSND indicating it would not be making an additional payment on the claim and it had been processed correctly. BCBSND explained that VMF had once been a participating provider but BCBSND had received a termination notice from VMF in the fall of 2013. Though BCBSND had worked to secure a

2

participation agreement, "[i]n response to [VMF's] proposed pricing, we conducted a regional analysis of air ambulance services and concluded the rates they proposed were excessive." Indicating that the determination through their internal appeal process was final, BCBSND informed Mr. Mitchell that an external review with the North Dakota Department of Insurance was available. BCBSND also stated that "[a]ny rule, guideline, protocol, diagnosis and treatment codes and their corresponding meaning or relevant documentation used to make this determination can be provided upon request, free of charge."

On July 30, 2015, Plaintiffs entered into an agreement with VMF (July 2015 Agreement) "pertain[ing] to the civil litigation involving [the Mitchells] and [BCBSND], as directly related to a suit filed or to be filed ("Lawsuit") in the United States District Court of North Dakota." The July 2015 Agreement is governed by Michigan law and provides that VMF has agreed to pay for the costs and attorney fees related to the Lawsuit and that the Lawsuit "seeks remedies against BCBSND by the Mitchells for issues related to the health insurance coverage held by [the] Mitchells." "[U]pon recovery of any money as a result of the Lawsuit, through litigation, settlement, or otherwise, the Mitchells and [VMF] agree to disburse such recovery" in the following order: "First, to repay [VMF] for all costs and attorney fees paid or owing in this matter; second, to satisfy any outstanding invoices to [VMF]; and third, the remainder, if any, will be split 70% to [VMF] and 30% to the Mitchells." Finally, "following the conclusion of the Lawsuit, [VMF] will thereafter waive all other claims it has against the Mitchells" and "limit any liability of the Mitchells to [VMF] to the amount recovered in [the] Lawsuit."

## PROCEDURAL BACKGROUND

The Mitchells filed this lawsuit against BCBSND on September 2, 2015. On October 12, 2016, the Parties entered a joint stipulation to stay this proceeding and remand the claim to the BCBSND Claims Administrator. Pursuant to the joint stipulation, BCBSND treated the submission as an original claim for benefits and on November 17, 2016, Plaintiffs' attorney submitted a letter and exhibits for review. On January 28, 2017, BDBSND notified Plaintiffs, through counsel, that the claim was allowed to the extent of benefits previously paid and was otherwise denied. Contrary to the earlier letter received by VMF, however, the November 17 Determination Letter informed Plaintiffs that the 20% non-participating provider reduction was not applied in making the determination because "one of the conditions for the imposition of a 20% reduction in calculating the amount of the Claim payable or reimbursable was not met because

the reduction applies only to certain procedure codes, and the procedure codes in this Claim are not among the ones that trigger the imposition of the 20% reduction." BCBSND internal policy on air ambulance reimbursement also provides that all air ambulance providers operating in North Dakota are reimbursed using the same methodology, whether they are participating or non-participating air ambulance providers. Further, the Determination Letter provided that the air ambulance services were not "emergency services" for purposes of the Affordable Care Act. On February 17, 2017, counsel for BCBSND received an email from Plaintiffs' counsel stating that Ms. Mitchell would not file any "further appeals."

Upon return to litigation, BCBSND moved this Court for limited written discovery beyond the administrative record in the form of one interrogatory, one request for production of documents, and one request for admission. The proposed discovery sought to uncover the July 2015 Agreement so that BCBSND may pursue a lack of standing theory. That request was granted by this Court on June 17, 2017. On October 19, 2017, Plaintiffs filed the pending Motion for Summary Judgment. A few days later, Defendant filed its pending Motion for Summary Judgment.

## LEGAL STANDARD

### I. SUMMARY JUDGMENT

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "[A] fact is 'material' if its resolution affects the outcome of the case." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A party asserting that a fact cannot be . . . disputed must support the assertion" either by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the . . . presence of a genuine dispute[.]" FED. R. CIV. P. 56(c)(1)(A)–(B). At summary judgment, the Court's function is not to weigh the evidence and determine the truth of the matter itself, but to determine whether there is a genuine issue for trial." *Nunn v. Noodles & Co.*, 647 F.3d 910, 914 (8th Cir. 2012).

In a motion for summary judgment, the moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations omitted). Once this burden is met, the burden then shifts to the non-moving party to demonstrate "that a fact . . . is genuinely disputed" either by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish

4

the absence . . . of a genuine dispute." FED. R. CIV. P. 56(c)(1)(A)–(B). The Court must view the evidence and "all justifiable inferences" in favor of the party opposing the motion. *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1377 (8th Cir. 1996). "'If reasonable minds could differ as to the import of the evidence,' summary judgment is inappropriate." *Id.* (citing *Anderson*, 477 U.S. at 250).

## II.    ERISA CLAIMS ADMINISTRATION

Where the claim at issue is denial of ERISA benefits, a plan administrator's denial of those benefits is reviewed de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). "If the plan grants such discretionary authority, then the plan administrator's decision is reviewed for abuse of discretion." *Waldoch v. Medtronic, Inc.*, 757 F.3d 822, 829 (8th Cir. 2014), *as corrected* (July 15, 2014). Here, the Plan states that "BCBSND shall construe and interpret the provisions of the Benefit Plan Agreement, the Certificate of Insurance and Summary Plan Description and related documents, including doubtful or disputed terms and to determine all questions of eligibility; and to conduct any and all review of claims denied in whole or in part." Doc. 31-1 at 7; Doc. 54 at ICPO 000194.[2] Further, Section 8 of the Plan provides that BCBSND shall determine the interpretation and application of the Definitions in each and every situation." *Id.*; Doc. 54 at ICPO 000266. Further, the Plan's definition of "Allowance" or "Allowed Charge" is "the maximum dollar amount that payment for a procedure or service is based on *as determined by BCBSND*." *Id.* (emphasis added). This language is sufficient to trigger the abuse-of-discretion standard. *See Hankins v. Standard Ins. Co.*, 677 F.3d 830, 835 (8th Cir. 2012) ("policy language reserving the power to 'resolve all questions . . . [of] interpretation'" indicates that the administrator has discretionary power to construe ambiguous terms.")

To withstand review for abuse of discretion, a decision "supported by a reasonable explanation . . . should not be disturbed, even though a different reasonable interpretation could have been made." *Midgett v. Wash. Grp. Int'l Long Term Disability Plan*, 561 F.3d 887, 897 (8th Cir. 2009) (internal quotation marks omitted). The plan administrator's decision must be reasonable, that is, it must be "supported by substantial evidence, meaning more than a scintilla but less than a preponderance." *Id.* "Any reasonable decision will stand, even if the court would

---

[2] The use of "ICPO" of "D" as a page number indicates that documents location in the administrative record.

interpret the language different as an original matter." *Manning v. Am. Republic Ins. Co.*, 604 F.3d 1030, 1038 (8th Cir. 2010). "The requirement that the [plan administrator's] decision be reasonable should be read to mean that a decision is reasonable if a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would* have reached that decision." *Jackson v. Metro. Life Ins. Co.*, 303 F.3d 884, 887 (8th Cir. 2002) (internal quotation marks omitted).

"Where the entity that administers an ERISA plan, such as an employer or an insurance company, both determines whether an employee is eligible for benefits and pays benefits out of its own pocket, a conflict of interest is created." *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 114 (2008).When a conflict of interest exists, "a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits, with the significance of the factor depending upon the circumstances of the particular case." *Id.* at 115.

## DISCUSSION

### I.     EVIDENCE OUTSIDE THE ADMINISTRATIVE RECORD

As an initial matter, Plaintiffs take issue with Defendant's citations to and the Court's potential consideration of the July 2015 agreement between Plaintiffs and VMF, a non-party to this litigation. Plaintiffs argue that it should not be considered as it is not part of the administrative record and "is essentially irrelevant" under Federal Rules of Evidence 401 and 402. Doc. 97 at 4. While it is true that the July 2015 agreement is irrelevant as to the merits of the case, it must be considered in order to address the issue of standing, as challenged by the Defendant in this case.

To "ensure expeditious judicial review of ERISA benefit decisions and to keep district courts from becoming substitute plan administrators," review under the deferential abuse of discretion standard is generally limited to the administrative record. *Cash v. Wal-Mart Group Health Plan*, 107 F.3d 637, 641–42 (8th Cir. 1997) (quoting *Donatelli v. Home Ins. Co.*, 992 F.2d 763, 765 (8th Cir. 1993). A district court may admit additional evidence in an ERISA benefit-denial case, however, upon a showing of good cause. *See Brown v. Seitz Foods, Inc., Disability Ben. Plan*, 140 F.3d 1198, 1200 (8th Cir. 1998).

"[S]tanding is a jurisdictional prerequisite that must be resolved before reaching the merits of a suit." *City of Clarkson Valley v. Mineta*, 495 F.3d 567, 569 (8th Cir. 2007). "If a plaintiff lacks standing, a district court has no subject matter jurisdiction over the matter and must dismiss the

6

case." *Murphy v. Minnesota Dept. of Human Services*, 260 F.Supp.3d 1084 (D. Minn. 2017) (citing *Young Am. Corp. v. Affiliated Comp. Servs., Inc.*, 424 F.3d 840, 843 (8th Cir. 2005)). When it is contended that the Court lacks jurisdiction, the Court "would be obliged to consider" that contention. *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 278 (1977). Indeed, the Court must raise the issue sua sponte "whenever a doubt arises as to the existence of federal jurisdiction." *Id.* Because Defendant argues that the terms of the July 2015 Agreement speak to the injury and redressability factors of a standing inquiry, good cause to consider evidence outside the administrative record is shown and the Court considers the July 2015 Agreement to address that argument.

## II.    STANDING

"When a plaintiff alleges injury to rights conferred by statute, two separate standing-related inquiries are implicated: whether the plaintiff has Article III standing (constitutional standing) and whether the statute gives that plaintiff authority to sue (statutory standing)." *Miller v. Redwood Toxicology Laboratory, Inc.*, 688 F.3d 928, 934 (8th Cir. 2012). Because Article III standing presents a question of justiciability—that is, whether the court has jurisdiction over the claim—constitutional standing must be decided first. *Id.* (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 92–94 (1998)). By contrast, statutory standing goes to the merits of the claim. *Id.* "Statutory standing is simply statutory interpretation: the question it asks is whether Congress [, or the State,] has accorded *this* injured plaintiff the right to sue the defendant to redress his injury." *Id.* (citing *Graden v. Conexant Sys., Inc.*, 496 F.3d 291, 295 (3d Cir. 2007) (emphasis in original)).

Defendant argues Plaintiffs no longer have standing to pursue this claim for two reasons. First, Defendant asserts that, because the July 2015 Agreement extinguishes any payment obligation of the Plaintiffs to VMF, Plaintiffs cannot show that they have suffered a concrete injury that can be redressed by these proceedings. Second, Defendant contends that because Plaintiffs are no longer covered under the Plan, Plaintiffs cannot show statutory standing.

### a.    *Art. III Standing*

"Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." *Raines v. Byrd*, 521 U.S. 811, 820 n. 3 (1997). The constitutional minimum of standing contains three elements: (1) "an 'injury in fact'"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not conjectural or hypothetical;'" (2) causation—"a causal connection

between the injury and the conduct complained of;" and (3) redressability—"it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal citations omitted).

The need to satisfy the requirements for Article III standing persist throughout the life of the lawsuit. *Wittman v. Personhuballah*, 136 S.Ct. 1732, 1736 (2016). Therefore, Plaintiffs may not rest their hat on the fact that this Court found that Plaintiffs had standing at an earlier stage in this litigation. Doc. 20. Instead, Plaintiffs continue to bear the burden of establishing the elements of standing. *See Spokeo, Inc. v. Robbins*, 136 S.Ct. 1540, 1547 (2016) ("The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements.").

Defendant maintains that, by entering into the July 2015 Agreement, Plaintiffs lost any standing to pursue this claim because "[u]nder the terms of that agreement, [VMF] released, cancelled, waived, extinguished, or bargained away any right it may once have had to receive anything of value from the Plaintiffs." Thus, Plaintiffs cannot produce evidence of unpaid bills as required in *Springer v. Cleveland Clinic Employee Health Plan Total Care*, 2017 WL 4837478 (N.D. Ohio 2017), because they were relieved of any requirement to pay VMF when they brought this action. Therefore, Plaintiffs no longer have an injury in fact as a result of a denial of benefits. Defendant argues this is true because the transport agreement and the July 2015 Agreement concern the same subject matter, extinguishing the first agreement and ridding Plaintiffs of any evidence of injury.

In response, Plaintiffs argue that 1) Defendant's reliance on *Springer* is misguided and the proper authority may be found in *Sprint Communications Co., L.P. v. APCC Services, Inc.*, 554 U.S. 269 (2008) and *North Cypress Medical Center Operating Co., Ltd. v. Cigna Healthcare*, 781 F.3d 182 (5th Cir. 2015); 2) the transport agreement and the July 2015 Agreement do not concern the same subject matter, therefore leaving the transport agreement in full effect; and 3) Plaintiffs have a continuing obligation to pursue their claims against Defendant under the July 2015 Agreement and to pay the amount of recovery to satisfy the unpaid bill, an injury which may be remedied by this litigation. Plaintiffs are also entitled to 30% of the remaining proceeds under the agreement. Ultimately, the Court finds Defendant's emphasis on the July 2015 Agreement to be misplaced, and that the answer to the question presented—namely, whether Plaintiffs have suffered an injury despite Plaintiffs' promise to pay any proceeds of the litigation to VMF—has been answered indirectly by the Supreme Court and directly by numerous circuit courts.

In *Sprint Communications*, payphone operators were owed money by long-distance carriers but, because the amounts of money owed were small, the operators found it useful to assign unpaid claims to "aggregators." These aggregators, in return for a fee, agreed to pursue the payphone operators' claims against the carriers, remitting the proceeds of the suits (minus their fee) to the payphone operators. In finding that the aggregators satisfied the injury prong of the standing analysis, the Court stated:

> It is, of course, true that the aggregators did not originally suffer any injury caused by the long-distance carriers; the payphone operators did. But the payphone operators assigned their claims to the aggregators lock, stock, and barrel. And within the past decade we have expressly held that an assignee can sue based on his assignor's injuries.

*Sprint Communications*, 554 U.S. at 286 (internal citations omitted).

In contrast to *Sprint Communications*, the Plaintiffs here have not assigned their claims to VMF "lock, stock, and barrel." Instead, Plaintiffs have asserted their own claim against Defendant, while assigning only the proceeds of this litigation to VMF in exchange for waiver of any claims VMF has against Plaintiffs. Defendant argues that the commencement of this litigation was enough for Plaintiffs to discharge their obligation under the July 2015 Agreement and thus, VMF is not actually requiring payment for the air ambulance transport. Even if this interpretation were supported by the language of the contract, Plaintiffs have still suffered an injury sufficient for Article III standing. Plaintiffs contracted for coverage under the Plan, Plaintiffs allegedly incurred charges for medical care and directed that the payments be made to the provider, but the full extent of those payments have allegedly not been made. Thus, Plaintiffs have allegedly been deprived of what they contracted for, which is sufficient to establish a concrete injury. *See North Cypress*, 781 F.3d at 193. *See also Katz v. Pershing, LLC*, 672 F.3d 64, 72 (1st Cir. 2012) ("[W]e think the better view is that when a plaintiff generally alleges the existence of a contract, express or implied, and a concomitant breach of that contract, her pleading adequately shows an injury to her rights.").

Defendant relies on *Springer* to support its contention that, without anything in the record indicating Plaintiffs would be billed by the provider, Plaintiffs lack standing. *See Springer*, 2017 WL 4837478 at *4–*6. However, this unpublished opinion out of the Northern District of Ohio appears to be an anomaly amongst those circuit court opinions holding otherwise. *See generally, DiCarlo v. St. Mary Hosp.*, 530 F.3d 255, 263 (3d Cir. 2008) ("To have standing to assert a breach of contract claim, plaintiffs need not wait until lawsuits against them were filed or collection

against began harassing them . . . . The expense is incurred, whether paid or not, at the time the patient enters a hospital with the understanding that he or she is liable for all or part of the charges for the services to be rendered." (citation omitted and internal quotation marks omitted)); *Spinedex Physical Therapy USA Inc. v. United Healthcare of Arizona, Inc.*, 770 F.3d 1282, 1291 (9th Cir. 2014) ("The fact that Spinedex has chosen not to seek payment from its assignors, despite its contractual right to do so, does not mean that Spinedex had no right to recover benefits under the Plans from Defendants. It means only that Spinedex has decided not to pursue its legal rights against its assignors."); *HCA Health Services of Georgia, Inc. v. Employers Health Insurance Co.*, 240 F.3d 982, 991 (11th Cir. 2001) (As a provider-assignee, HCA had standing to sue for the recovery of benefits despite the fact that it had never billed its patient-assignor for the amount EHI refused to pay.). Therefore, the Court finds Plaintiffs suffered a concrete injury when Defendant deprived Plaintiffs of benefits allegedly owed under the terms of the Plan, regardless of VMF's decision not to pursue its legal rights.

As for the redressability component of the standing analysis, this Court again turns to *Sprint Communications* for guidance. In addressing the argument that the aggregators could not satisfy the redressability requirement of standing because, if successful in the litigation, the aggregators were simply to remit the proceeds to the payphone operators, the Court found:

> [P]etitioners misconstrue the nature of our redressability inquiry. That inquiry focuses, as it should, on whether the injury that a plaintiff alleges is likely to be redressed through the litigation—not on what the plaintiff ultimately intends to do with the money he recovers. Here, a legal victory would unquestionably redress the injuries for which the aggregators bring suit. The aggregators' injuries relate to the failure to receive the required dial-around compensation. And if the aggregators prevail in this litigation, the long-distance carriers would write a check to the aggregators for the amount of dial-around compensation owed. What does it matter what the aggregators do with the money afterward? The injuries would be redressed whether the aggregators remit the litigation proceeds to the payphone operators, donate them to charity, or use them to build new corporate headquarters.

*Sprint Communications*, 554 U.S. at 286 (internal citations omitted). The question of whether the money is in fact owed in light of particular provisions of the Plan goes to the merits, not redressability. *See North Cypress*, 781 F.3d at 191, 193 n. 39 ("The merits here include the question of what 'charges which you are not obligated to pay or for which you are not billed' means under the plans, and thus the amount of reimbursement due North Cypress."). Therefore, Plaintiffs have met their burden of establishing each of the elements of Article III standing.

b. *Statutory Standing*

Defendant also argues that Plaintiffs lack statutory standing because they are no longer covered under the Plan. ERISA allows for a federal cause of action for civil claims to be brought "by a participant or beneficiary" to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132 (a)(1)(B). The term "participant" is defined for purposes of ERISA as "any employee or former employee of an employer...who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer...or whose beneficiaries may be eligible to receive any such benefit." 29 U.S.C. § 1002(7). The term "beneficiary" is defined as "a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder." 29 U.S.C. § 1002(8).

"The fact that they were plan participants in the past is irrelevant. 'The statute by its terms does *not* permit a civil action by someone who was a participant at the time of the alleged ERISA violation. Rather, it is written in the present tense, indicating that current participant status is the relevant test.'" *Adamson v. Armco*, 44 F.3d 650, 654 (8th Cir. 1995) (quoting *Raymond v. Mobil Oil Corp.*, 983 F.2d 1528, 1534–35 (10th Cir. 1993) (emphasis in original)). As construed by the Supreme Court, the term "participant" is read to include "former employees who have a reasonable expectation of returning to covered employment or who have a colorable claim to vested benefits." *Firestone Tire Rubber Co. v. Bruch*, 489 U.S. 101, 117 (1989) (internal quotations omitted). To establish that a claimant "may become eligible" for benefits, he or she "must have a colorable claim that (1) he [or she] will prevail in a suit for benefits, or that (2) eligibility requirements will be fulfilled in the future." *Id.* at 117–18. The Eighth Circuit has adopted an exception to this requirement in which, "but for the employer's conduct alleged to be in violation of ERISA," the employee or former employee would be a plan participant. *See Adamson*, 44 F.3d at 654–55 (citing *Howe v. Varity Corp.*, 36 F.3d 746 (8th Cir. 1994). Because Mr. Mitchell does not contend that he is a current employee or has a reasonable expectation of returning to employment with Towner County Medical Center, nor does he argue that, but for Towner County Medical Center's conduct in violation of ERISA he would still be a plan participant, Mr. Mitchell's status as a participant, and therefore his wife's standing as a beneficiary, is dependent upon whether he currently has a

"colorable claim to vested benefits." *See id.* (finding no colorable claim to vested benefits where claims are barred by applicable statute of limitations).

The standard for a colorable claim is low. A colorable claim is one that non-frivolous but "need not have a likelihood of success on the merits." *Albers v. Mellegard, Inc.*, 2008 WL 7122683 at *13 (D.S.D. 2008); *see also Panaras v. Liquid Carbonic Industries Corp.*, 74 F.3d 786, 791 (7th Cir. 1996). Certainly, Plaintiffs have made a non-frivolous argument that the Plan was unreasonably interpreted, depriving them of rights promised to them by the Plan. Further, the Ninth Circuit, in examining Supreme Court case law post-*Firestone Fire*, clarified what is required to satisfy the requirements for "vested benefits" in the context of welfare plans instead of pension plans:

> The Supreme Court recently clarified this point in *LaRue v. DeWolff, Boberg & Associates*, 552 U.S. 248, 128 S.Ct. 1020, 1026 N. 6, 169 L.Ed.2d 847 (2008), stating that a "Plan 'participant,' as defined by . . . 29 U.S.C. § 1002(7), may include a former employee with a colorable claim for benefits." In support of this proposition, the opinion cites *Harzewski v. Guidant Corp.*, 489 F.3d 799 (7th Cir. 2007), a case which notes that the *Firestone Tire* Court "glossed 'benefit' in section 1002(7) as 'vested benefit,' which has caused the lower courts a good deal of angst." *Id.* at 806. "But in context," The Seventh Circuit continued, it is apparent that all the Court meant was that the former employee had to have an entitlement— had to show that had it not been for the trustees' breach of their fiduciary duty he would have been entitled to greater benefits than he received." *Id.*
>
> We are satisfied that *LaRue* remedied the "angst" noted by the Seventh Circuit by loosening the requirement that the claimed benefits be "vested," at least insofar as vested means permanently fixed and unalterable. This understanding is supported by two Supreme Court decisions decided between *Firestone Tire* and *LaRue.*

*Poore v. Simpson Paper Co.*, 566 F.3d 922, 925–26 (9th Cir. 2009).

The Supreme Court cases referred to in *Poore* are *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73 (1995) and *Inter-Modal Rail Employees Ass'n v. Atchison, Topeka & Santa Fe Railway*, 520 U.S. 510 (1997). First, in *Curtiss-Wright*, the Court allowed former employees to use the civil enforcement provision of ERISA when claiming that their welfare benefit plan did not contain an amendment procedure as required by ERISA despite recognizing that ERISA does not establish any minimum vesting requirements for health plans. *See Curtiss-Wright*, 514 U.S. at 78; *see also id.* at 85. Further, in *Inter-Modal*, the Court held that the protections of 29 U.S.C. § 1140 extend to those with non-vested rights. *See Inter-Modal*, 520 U.S. at 514–15.

Critically, the Court noted, Congress used the term "plan" in the statute—a term used to denote both those that must vest and those that do not vest unless by contract. If Congress had intended to limit § 1140's protection to holders of vested rights, it could have spoken in terms of "pension plan[s]," which must vest, or of "nonforfeitable" rights. Likewise, as is the situation here, if Congress intended to limit the right to sue under § 1132 to vested right-holders, it would have said so instead of granting it to "participant[s]" (a defined term which includes both vested and non-vested persons)."

*Poore*, 566 F.3d at 926 (citing *Inter-Modal*, 520 U.S. at 514–15) (internal citations omitted).

Accordingly, the Court is satisfied that in the case of welfare benefit plans such as the one at issue here, Plaintiffs need not show that their benefits are vested in the way that pension benefits are vested. Instead, they need only show they have "a colorable claim to benefits which the employer promised to provide pursuant to the employment relationship and which a non-frivolous argument suggests have accrued to the employee's benefit." *Panaras*, 74 F.3d at 791. Plaintiffs have met their burden of proof that they have statutory standing.

III.    MERITS

In this action to recover health care benefits under ERISA § 502(a)(1)(B), Plaintiffs' challenge three points of error in BCBSND's final determination: 1) that BCBSND violated the terms of the Mitchell's plan by failing to cover medical supplies using an undisclosed administrative policy that conflicted with the express terms of the Mitchell's plan; 2) that the administrative policy that set the reimbursement rate for air ambulance mileage charges was undisclosed and not based on substantial evidence of reasonable provider reimbursement rates; and 3) that the air ambulance base rate was established by an undisclosed policy and not based on substantial evidence of a reasonable rate.

The Eighth Circuit uses two distinct tests to analyze whether a plan administrator abused its discretion in making benefit determinations. *See Hanna v. United of Omaha Life Ins. Co.*, 553 F.Supp.2d 1064, 1068 (S.D. Iowa 2008) (citing *King v. Hartford Life & Acc. Ins. Co.*, 414 F.3d 994, 999 (8th Cir. 2005)). First, determining whether the plan administrator's interpretation of the plan terms was reasonable requires the application of the five-factor test enumerated in *Finley v. Special Agents Mut. Benefit Ass'n Inc.*, 957 F.2d 617, 621 (8th Cir. 1992). Next, the Court must decide: 1) if the plan administrator "reasonably applied its interpretation of the term to the facts of the claim," and 2) if the decision was supported by substantial evidence on the record. *Hanna*, 553 F.Supp.2d at 1068.

### a. Reasonableness of Interpretation

The five factors of the *Finley* test include (1) "whether [the plan administrator's] interpretation is consistent with the goals of the Plan;" (2) "whether their interpretation renders any language in the Plan meaningless or internally inconsistent;" (3) "whether their interpretation conflicts with the substantive or procedural requirements of the ERISA statute;" (4) "whether they have interpreted the words at issue consistently;" and (5) "whether their interpretation is contrary to the clear language of the Plan." *Finley*, 957 F.2d at 621. Essentially, for a plan administrator's interpretation to be reasonable, consistence is key. An interpretation will be upheld if it is consistent with the Plan's goals, with the goals of the ERISA statute, with past interpretations of the same term, and with other language within the Plan.

The services provided by VMF were billed under three different billing codes: 1) A0430, the air ambulance base rate, for $21,500.00; 2) A0435, the air ambulance mileage allowance, for $11,250.00; and 3) A0398, other charges—namely, for administering intravenous fluids during transportation, for $450.00. On March 27, 2014, BCBSND paid $5,280.81 for A0430; $1,479.17 for A0435; and $0.00 for A0398 for a total of $6,759.98. This left the Mitchells to cover the remaining $26,440.02: $1,525.83 in coinsurance liability and $24,914.19 in balance bill liability. Plaintiffs argue that Defendant improperly relied upon undisclosed internal policies that conflicted with the express terms of the Plan in administering the claim and asks the Court to declare Plaintiff's cost-sharing obligations are limited to $1,525.83 after all sums are paid by BCBSND.

Under the Plan, the Allowed Charge, or Allowance, is the maximum dollar amount that payment for a procedure or service is based on as determined by BCBSND. The Cost-Sharing Amount is the dollar amount a plan participant is responsible for paying when receiving Covered Services—"Medically Appropriate and Necessary services and supplies for which benefits are available when provided by a Health Care Provider." Cost-Sharing Amounts include Coinsurance and Deductible Amounts. The Coinsurance Amount is the percentage of the allowed charge for Covered Services that is a plan participant's responsibility and the Deductible Amount is a specified dollar amount payable by the member for certain Covered Services received throughout the yearly benefit period. The total Deductible and Coinsurance Amounts for certain Covered Services combine to form the Out-of-Pocket Maximum Amount, which is the maximum amount a plan participant will be responsible for, after which the Plan will pay 100% of the Allowed Charges for Covered Services incurred during the remainder of that benefit period. In sum, benefits

are payable under the Plan only for "Covered Services" and the amount payable to reimburse a participant for Covered Services is the Allowed Charge, less any applicable Deductible Amount, reduced by any Coinsurance Amount to the extent that the Coinsurance Amount does not cause the participant to exceed the Out of Pocket Maximum.

While members are to contribute to the Deductible and Coinsurance Amounts, "a Member's contribution cannot be more than the Single Coverage amount," which is $2,500. Thus, the Coinsurance Amount also is limited to $2,500 per person per benefit period and the applicable Out-of-Pocket Maximum is $5,000 per person per benefit period. Under Family Coverage, the total Deductible Amount is $5,000 and the Out-of-Pocket Maximum is $10,000. As of the date of the air ambulance transport, Ms. Mitchell had already satisfied her individual Deductible and had satisfied all but $1,525.83 of her Out-of-Pocket Maximum.

To determine the reasonableness of Defendant's interpretation of the Plan terms, the Court analyzes the process followed by Defendant to reach its conclusion, keeping in mind it is the Court's responsibility to confirm that the plan administrator interprets its policies in a reasonable manner, even where other interpretations may be available. *See Midgett*, 561 F.3d at 897. First, the bill for the air ambulance base rate was $21,500.00 and the air ambulance mileage allowance was billed at $11,250.00. The bill for the other charges—the administration of intravenous fluids during transportation—was for $450.00. BCBSND determined the air ambulance transportation services qualified as Ambulance Services under the plan. Ambulance Services are defined as "Medically Appropriate and Necessary Ambulance Services to the nearest facility equipped to provide the required level of care, including transportation...between Hospitals." Doc. 54 at ICPO 000227. In turn, Medically Appropriate and Necessary is defined as

> [S]ervices, supplies or treatments provided by a Health Care Provider to treat an illness or injury that satisfy all the following criteria as determined by BCBSND:
> A. The services, supplies or treatments are medically required and appropriate for the diagnosis and treatment of the Member's illness or injury;
> B. The services, supplies or treatments are consistent with professionally recognized standards of health care; and
> C. The services, supplies or treatments do not involve costs that are excessive in comparison with alternative services that would be effective for diagnosis and treatment of the Member's illness or injury.

*Id.* at ICPO 000272. An internal document explains that it is BCBSND's policy not to cover ambulance supplies, including saline IV solutions, as of January 1, 2002. In its Determination

Letter, BCBSND stated that the $450.00 charge for procedure code A0398 was actually included as a service under procedure code A0430—the air ambulance base rate—and therefore the charge was not technically completely denied.

According to the Plan, for Ambulance Services, BCBSND will pay for 80% of the Allowed Charge—the maximum dollar amount that payment for ambulance services is based on.[3] However, other than to say how the Allowed Charge is reduced by the Cost-Sharing Amounts, Defendant can point to no language in the Plan itself that establishes how one is to calculate the Allowed Charge. Instead, Defendants rely upon a letter dated January 13, 2014 and sent to BCBSND's Participating Providers, which provides that BCBSND covers air ambulance rates for codes A0430 and A0435 at 150% of the 2013 Medicare rural air ambulance rates. Plaintiffs themselves are not Providers, they are Participants. This means that it is the health care service providers that received this letter, not the Mitchells themselves, who are expected to pay for noncovered services.

Applying the 2013 Medicare rural air ambulance rates, the allowed charge for the air ambulance base rate was $6,601.01. The allowed charge for air ambulance mileage rate was $18.72 per mile for a distance traveled of 90 miles. Therefore, the Allowed Charge for the air ambulance mileage rate was 90 times $18.72 or $1,684.80. Together, the Allowed Charges totaled $8,285.81. The Plan allows for Ambulance Services to be covered at 80% of the Allowed Charge, or $6,628.65, leaving the Participant's coinsurance liability at 20% of the Allowed Charge, or $1,657.16. At the time the services were provided, however, Ms. Mitchell had satisfied all but $1,525.83 of her Out-of-Pocket Maximum Amount. Therefore, Ms. Mitchell's coinsurance liability was $1,525.83 and the amount payable by the Plan was $8,285.81 minus $1,525.83, or $6,759.98.

According to the terms of the Plan, if VMF was a Participating Health Care Provider, a provider discount provision would result in the total of Ms. Mitchell's coinsurance and the amount payable by the Plan as payment in full. Doc. 53 at ICPO 000206. In other words, VMF would have been entitled to $8,285.81 and, because of the participation agreement between VMF and BCBSND, VMF would not have been entitled to receive anything more. However, because VMF

---

[3] According to Defendant's interpretation of the Plan language, the air ambulance services were considered Ambulance Services, rather than Emergency Services. The Plan defines Emergency Services as "health care services, supplies or treatments furnished or required to screen, evaluate and treat an Emergency Medical Condition." Defendant's state that because "air ambulance transportation is not a health care service and is not performed in a hospital" the Emergency Services provision is not applicable to air ambulance transportation. The term "health care services" is not defined by the Plan.

is a Nonparticipating Health Care Provider,[4] there is no provider discount provision in place, leaving the remaining charges still owed because the coinsurance liability and the amount payable by the Plan is not considered payment in full. *Id.* at ICPO 000207. Further, even though the Out-of-Pocket Maximum Amount is met, BCBSND is not required to pay anything more because the Allowed Charge, the $8,285.81, has already been paid and the terms of the Plan provide that BCBSND is only required to pay 100% of the *Allowed Charge* after that Out-of-Pocket Maximum Amount is met. Plaintiffs, as the insureds, did not choose the air ambulance provider. If the air ambulance provider would have been a participating Health Care Provider, Plaintiffs would only have owed $1525.83, the unsatisfied amount of Ms. Mitchell's Out-of-Pocket Maximum.

The Plan is an employee welfare benefit plan—specifically, a high deductible health plan designed to comply with Section 223 of the U.S. Internal Revenue Code and intended for use with a Health Savings Account (HSA). With regard to the first *Finley* factor—consistency of the interpretation with the goals of the Plan—the Plan does not explicitly state its purpose other than to "provide, among other things, various benefits to Members in the Plan." Regarding the third *Finley* factor—consistency of the interpretation of the Plan with the substantive and procedural goals of the ERISA statute—generally, ERISA represents a balance between ensuring fair and prompt enforcement of rights under employee benefit plans while also encouraging the creation of such plans. *See Conkright v. Frommert*, 559 U.S. 506, 517 (2010).Thus, ERISA's general purpose is to protect employee benefit plan participants and beneficiaries against fiduciary abuses and mismanagement by ensuring proper and uniform administration of employee benefits through oversight systems and other standard procedures. *See Gobeille v. Liberty Mut. Ins. Co.*, 136 S.Ct. 936, 946 (2016); 29 U.S.C. § 1001(a)–(c). Because ERISA's goal is to ensure fair and prompt enforcement of rights to benefits, "ERISA requires employee benefit plans to 'provide adequate notice' to any participant or beneficiary whose claim is denied, 'setting forth the specific reasons for such denial' in a manner 'calculated to be understood by the participant.'" *King*, 414 F.3d at 999 (quoting 29 U.S.C. § 1133). To this end, plan trustees must "briefly state the facts of the case and the rationale for their decision" and the Court must refuse to allow claimants "to be sandbagged by after-the-fact plan interpretations devised for purposes of litigation." *Id.* (internal citations

---

[4] The Plan Document also provides that if a member receives services from a nonparticipating provider within the state of North Dakota or a county contiguous with North Dakota, benefit payments will be based on the Allowance and reduced by an additional 20%. Other documentation provided by Defendant, however, states that this additional 20% reduction was not applicable to the Mitchells' claim and it was not applied.

omitted). The Court considers the final determination letter of Deb Dietz to be just that, a prolix "after-the-fact plan interpretation devised for purposes of litigation." Accordingly, the Court did not consider that letter in deciding this case.

Although it was the providers and not the Plaintiffs themselves that first received advance notice of the rates at which ambulance services are paid, Plaintiffs were ultimately provided this information through the claim process. It cannot be said that a payment of 150% of the 2013 Medicare rural air ambulance rates is inconsistent with the goals of the plan and the goals of ERISA. Further, it cannot be said that the rate is supplied as a post-hoc rationale when the 2014 letter establishes that rate just prior to the provision of services received by Ms. Mitchell, even though the Mitchells at that time had no notice of the letter.

The second, fourth, and fifth *Finley* factors ultimately require the Court to determine if Defendant's interpretation of the plan was consistent with past interpretations of the same terms as well as other language within the Plan. Providing a payment of 150% of the Medicare rural air ambulance rate as the Allowed Charge for Ambulance Services does not render any of the terms of the Plan itself inconsistent or even superfluous, mostly because the provisions of the Plan are written quite broadly. According to the Plan, for Ambulance Services, BCBSND will pay for 80% of the Allowed Charge—or 80% of 150% of the 2013 Medicare rural air ambulance rate. Further, even though the Out-of-Pocket Maximum Amount is met, BCBSND is not required to pay anything more than 150% of the Medicare rural air ambulance because the Allowed Charge, 80% of the 150% of the Medicare rural air ambulance rate, has already been paid and the terms of the Plan provide that BCBSND is only required to pay 100% of the *Allowed Charge* after that Out-of-Pocket Maximum Amount is met. Although the Court finds it troubling that the participants of the plan themselves are not provided this information outright, the Court cannot say that ERISA requires insurance companies to do so.

While the *Finley* factors "inform [the Court's] analysis, 'the dispositive principle remains…that where plan fiduciaries have offered a 'reasonable interpretation' of disputed provisions, courts may not replace [it] with an interpretation of their own and therefore cannot disturb as an 'abuse of discretion' the challenged benefits determination.'" *Finley* at 621 (quoting *Nobel v. Vitro Corp.*, 885 F.2d 1180, 1188 (4th Cir. 1989)). Ultimately, though the Court itself would conduct a more thorough analysis of the *Finley* factors, "an administrator with discretion under a plan to construe uncertain terms is not bound by this same interpretation." *King*, 414 F.3d

at 999. The language of the Plan itself does not preclude the use of 150% of 2013 Medicare rural air ambulance rate as the Allowed Charge. The fact that the Plan does not preclude such a rate does not mean, *ipso facto*, that it is a reasonable rate to apply. The administrative record does not show what considerations were used in arriving at the 2013 Medicare rural air ambulance rate. In addition, the Administrative Record does not show what BCBSND's basis was for selecting to pay 150% of the Medical rural air ambulance rate as the Allowed Charge. Indeed, at least two administrative courts have found the use of Medicare charges alone to not be a valid basis for setting private insurance rates where their respective state laws have required evidence of payment adjustment factors. *See Khaw v. Allstate Ins. Co.*, ATX-2007-5-P (Hawaii. Ins. Comm. Oct. 16, 2008) (holding that emergency medical providers' fees could not be limited to an arbitrarily set fixed multiple of the Medicare fee schedule because Hawaii's statutory code expressly exempted emergency services provided within the first seventy-two hours from adherence to the workers compensation supplemental fee schedule); *Phi Air Med. v. Texas Mutual Ins. Co.*, M4-12-1671-02, (Texas Dept. Ins. Jan. 13, 2012) (holding the rate of reimbursement unlawful where the insurance company had merely paid for air ambulance services at 125 percent of the Medicare rate without showing it had developed other conversion and payment adjustment factors as required by the Texas Labor Code, the rate of reimbursement unlawful).

Further, in reviewing the *Finley* factors, which are not exclusive, the Court is also to consider conflicts of interest, if any. *Glenn*, 554 U.S. at 115. There is an inherent conflict of interest where, as here, the insurer not only initially processes the claim, but also adjudicates the appeal of the determination of its previous decision on that same claim. In addition, in this case there had been an adverse exchange between BCBSND and the air ambulance provider.

Nevertheless, having considered the above and the fact that BCBSND has discretionary authority to decide claims against it by its own insured, the Court cannot say that the decision was an abuse of discretion. A *Finley* analysis is surely rendered less meaningful where the insurer has discretionary authority as was granted in this insurance contract. Some states, such as South Dakota, have by insurance department regulation precluded the unilateral granting of such discretionary authority by contract. *See* S.D. A.D.C. 20:06:52:02.

The question remains whether the inclusion of the $450.00 charge for procedure code A0398 as a service under procedure code A0430 was reasonable. An internal document states that it is BCBSND's policy not to cover ambulance supplies, including saline IV solutions, as of

January 1, 2002. However, in its Determination Letter, BCBSND stated that the $450.00 charge for procedure code A0398 was actually included as a service under procedure code A0430—the air ambulance base rate—and therefore the charge was not technically completely denied. The Plan defines Ambulance Services as "Medically Appropriate and Necessary Ambulance Services to the nearest facility equipped to provide the required level of care, including transportation...between Hospitals." Doc. 54 at ICPO 000227. In turn, Medically Appropriate and Necessary is defined as

> [S]ervices, supplies or treatments provided by a Health Care Provider to treat an illness or injury that satisfy all the following criteria as determined by BCBSND:
>> A. The services, supplies or treatments are medically required and appropriate for the diagnosis and treatment of the Member's illness or injury;
>> B. The services, supplies or treatments are consistent with professionally recognized standards of health care; and
>> C. The services, supplies or treatments do not involve costs that are excessive in comparison with alternative services that would be effective for diagnosis and treatment of the Member's illness or injury.

*Id.* at ICPO 000272.

As was the case with the Allowed Charge for the Ambulance Services, the interpretation offered by the administrator in including the charge for the IV within the base rate for Ambulance Services is consistent with the language of the plan, which includes services, supplies or treatments used to treat an illness or injury falls within the Plan's definition of Ambulance Services. Nevertheless, Plaintiffs argue that this explanation is merely a post-hoc rationale offered in anticipation of litigation and should not be considered. *See Short v. Central States, Southeast and Southwest Areas Pension Fund*, 729 F.2d 567, 575 (8th Cir. 1984) ("A post hoc attempt to furnish a rationale for a denial of pension benefits to avoid reversal on appeal, and thus meaningful review, diminishes the integrity of the Fund and its administrators. ERISA and its accompanying regulations 'were intended to help claimants process their claims efficiently and fairly; they were not intended to be used by the Fund as a smoke screen to shield itself from legitimate claims.'"). Indeed, this Court is precluded from affirming a benefits denial on the basis of a post-hoc rationale that was not expressed when benefits were denied. *See King*, 414 F.3d at 1003–05. As this Court declared above, the final determination letter was clearly an "after-the-fact plan interpretation devised for purposes of litigation." Indeed, it was only after federal litigation had commenced and been stayed for a final administrative review that this explanation was thoroughly provided. The

Court refuses to allow Plaintiffs "to be sandbagged by after-the-fact plan interpretations devised for purposes of litigation," *King*, 414 F.3d at 999 (internal citations omitted), accordingly, the Court finds Defendant abused its discretion in denying the $450.00 charge for procedure code A0398.

### b. Substantial Evidence

A plan administrator's *fact-based determinations* are reasonable if supported by substantial evidence. *Norris v. Citibank, N.A. Disability Plan (501)*, 308 F.3d 880, 883–84 (8th Cir. 2002) (emphasis added). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Both the quantity and quality of evidence may be considered." *Id.* (internal quotations omitted) (quoting *Fletcher-Merrit v. NorAm Energy Corp.*, 250 F.3d 1174, 1179 (8th Cir. 2001)).

Implicit in Plaintiffs' arguments that Defendant's reimbursement rates were not supported by substantial evidence on the record is the contention that Defendant's reimbursement rates are factual determinations subject to review for substantial evidence by this Court. Plaintiffs cite two administrative decisions, one from Hawaii and one from Texas, as support for the idea that reimbursement rates must be set according to substantial evidence of reasonable rates. *Khaw*, ATX-2007-5-P, did indeed hold that Hawaii's Insurance Code could not be interpreted to limit emergency medical providers' fees to an arbitrarily set fixed multiple of the Medicare fee schedule. However, this finding was made because Hawaii's statutory code expressly exempted emergency services provided within the first seventy-two hours from adherence to the workers compensation supplemental fee schedule. Thus, the Commission held that fees for emergency services cannot be tied to the workers compensation fee schedule, or by analogy the Medicare standard, or an arbitrary fixed multiple of the same. Doc. 52 at ICPO 000086–88. Similarly, in *Phi Air Med.*, M4-12-1671-02, the Texas Department of Insurance relied upon Texas Labor Code § 413.011(b) which required that "[i]n determining the appropriate fees, the commissioner shall also develop one or more conversion factors or other payment adjustment factors taking into account economic indicators in health care and the requirements of Subsection (d) . . . This section does not adopt the Medicare fee schedule, and the commissioner may not adopt conversion factors or other payment adjustment factors based solely on those factors as developed by the federal Centers for Medicare and Medicaid Services." Because the insurance company had merely paid for air ambulance services at 125 percent of the Medicare rate without showing it had developed other conversion and

payment adjustment factors as required by the Texas Labor Code, the Department of Insurance found the rate of reimbursement unlawful. *Id.* at ICPO 000096–102. By contrast, Plaintiffs in this case have not pointed to, and the Court cannot find, a North Dakota statute or administrative rule similar to those relied upon in the administrative decisions above.

Plaintiffs also cite *Schwartz v. Oxford Health Plans, Inc.*, 175 F. Supp. 2d 581, 589–90 (S.D.N.Y. 2001), *abrogated on other grounds by S.M. v. Oxford Health Plans (NY), Inc.*, 94 F. Supp. 3d 481 (S.D.N.Y. 2015) for support saying *Schwartz* overturned a denial that was not arrived at using an evidentiary basis for its rate setting. Under the terms of the plan in *Schwartz*, the plaintiff's non-network treatment was covered as follows: "subject to specified deductibles and coinsurance, Oxford would fully reimburse the charges to the extent that they did not exceed the 'usual, customary and reasonable' ('UCR') rates for such services and procedures." *Schwartz*, 175 F. Supp. 2d at 583. The term UCR was defined as follows:

> A UCR schedule is a compilation of maximum allowable charges for various medical services. They vary according to the type of provider and geographic location. Fee schedules are calculated using data compiled by the Health Insurance Association of America (HIAA) and other recognized sources. What We Cover/reimburse is based on the UCR. For example: Our benefit is 80% of the cost of Covered Services. We will reimburse you 80% of the UCR for that service. If the charges exceed the UCR, you must pay the difference plus the 20% Coinsurance.

*Id.* The court, in determining whether Oxford's interpretation of the phrase "usual, customary, and reasonable" was lawful, stated that it was unreasonable for Oxford to determine the providers rates exceeded the UCR by comparing the providers rates with that of individual private physicians, rather than those charged by hospital facilities comparable to the provider. *Id.* at 589–90.

Defendant argues that Plaintiffs are attempting to parlay a standard of reasonable interpretation into a standard of substantive rationality. The Court agrees. The court in *Schwartz* concluded that the UCR rates were incorrect because they were inconsistent with the terms of the plan, thus relying on a standard of reasonable interpretation, not a standard of substantive rationality. "Nothing in ERISA requires employers to establish employee benefit plans. Nor does ERISA mandate what kind of benefits employers must provide if they choose to have such a plan. ERISA does, however, seek to ensure that employee will not be left empty-handed once employers have guaranteed them certain benefits." *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996) (internal citations omitted) (citing *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 91 (1983); *Alessi v.*

*Raybestos-Manhattan, Inc.*, 451 U.S. 504, 511 (1981)). To ensure this, the Eighth Circuit requires the Court, after determining whether the plan administrator's interpretation of the plan terms was reasonable using the *Finley* factors, to decide: 1) if the plan administrator "reasonably applied its interpretation of the term to the facts of the claim," and 2) if the fact-based determinations were supported by substantial evidence on the record. *Hanna*, 553 F.Supp.2d at 1068; see also *Norris*, 308 F.3d at 883–84.

There are no fact-based determinations at issue here. Defendants do not even contest that the air ambulance services were Medically Appropriate and Necessary. They have merely applied their interpretation of the Plan's terms, specifically the terms "Allowed Charge" and "Out-of-Pocket Maximum Amount," to the treatment received by Ms. Mitchell. Because "nothing in ERISA regulates the content of welfare plans," *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 736 (1985), and because there is no state statutory or administrative guideline which requires reimbursement rates to be set according to a particular method, the rate at which reimbursement is set is not a fact subject to review by this Court beyond what is provided by the Plan terms. Thus, this is purely an issue of reasonable interpretation of Plan terms as resolved above.

IT IS ORDERED:

1. Plaintiffs' Motion for Summary Judgment, Doc. 77, is DENIED as to the charges for procedure codes A0430 and A0435 and GRANTED with respect to the $450.00 charge for procedure code A0398; and

2. Defendant's Motion for Summary Judgment, Doc. 82, is GRANTED as to the charges for procedure codes A0430 and A0435 in part and DENIED with respect to the $450.00 charge for procedure code A0398.

Dated this 18 day of July, 2018.

BY THE COURT:

_Lawrence L. Piersol_
Lawrence L. Piersol
United States District Judge